319-0086 Debra King Appellant by Jacob Frost v. Jane Carroll Rossi at police by Jane Lawson and Jim Malouf, Realty Inc. et al. at police by Craig Unbrek Mr. Frost Good afternoon. My name is Jacob Frost, appearing on behalf of Plaintiff Debra King, Counsel. Your Honors, may it please the Court. Lake Wildwood is a gated, protected community in Marshall County, Illinois. There is a set of protective covenants that are in place benefiting the development and the folks that own property there. Article 12 of those protective covenants lays out a right of first refusal scheme that applies to this case. The Rossis, defendant's Rossis, sold their back-to-back lots, Lot 141 and Lot 116, to the defendant's collect. At that time, on Lot 141, there is a garage serving the house that is also on Lot 141. At the time of the sale, Lot 116 was a vacant lot. One could pull right off of Clubhouse Drive, as shown on the survey, and pull into the garage on Lot 141 and walk up the flight of stairs leading to the house on Lot 141 in a bottom net. The plaintiff owns Lot 117. If one is facing to the rear of Lot 116, the plaintiff's lot is on the left. The Rossis did not give King any Article 12 offer before accepting the collect's offer to purchase the property, or before closing on the sale to collect's. When King, the plaintiff, discovered that the property had been sold, closed, and she hadn't received an offer, she had contacted the property manager of the association. Word traveled back to the dual agent, the broker that had been involved in the transaction, and the dual agent resolved to prepare a one-page form and tape that one-page form to plaintiff's garage door. After the form was taped to plaintiff's garage door, plaintiff then arranged for her husband to call the agent to inquire about doing a walk-through inspection of the home on Lot 141. And the response from the agent was that a walk-through inspection would not be arranged, because the transaction had already closed. This is a right of first refusal case involving a package deal. Add issue is whether plaintiff received the notice, meaning the offer, containing the same terms, not only the price, but the same terms as the 12-page offer that the Collettes had made to the Rossis that the Rossis accepted. The ancillary issue is whether, based upon the facts of the case, the undisputed facts of the case, whether plaintiff's letter that she sent out after her inquiry about doing a walk-through was denied, plaintiff's letter demanding to purchase Lot 116 at its fair market value constituted a waiver, a knowing waiver, of plaintiff's valuable right of first refusal and all of her remedies for that breach. As far as I know, based upon the Retreat v. Bell case, which is a 1st District 1998 case cited in the briefs, there could be three possible remedies for a breach of right of first refusal in a package deal case. And as far as I know, this is a case of first impression as to what Illinois law would provide in terms of a remedy for a breach of a right of first refusal in a package deal. But the Retreat v. Bell case analyzed three different remedies that other states have used in similar types of cases. The first possible remedy would be injunctive relief, requiring that the grantee reconvey the part subject to the right of first refusal back to the grantor with an injunction that would prevent a sale of that part to anybody else without first the Article 12 offer being made to the holder of the right of first refusal. So that was one of the three remedies. The second remedy would involve the court fashioning and determining what the fair market value of that part would be based upon the terms of the deal and granting specific performance to the plaintiff, requiring that the plaintiff, if they want the property, they pay the money, and on the same terms, they get the property. And the third remedy would be a remedy at law, and it would be money damages. Based upon our review of Illinois law, it would seem that specific performance is the remedy for a breach of a right of first refusal under the Anderson, Daniel v. Anderson case. And so that was one of the remedies requested in plaintiff's second amended complaint. But we're here because the trial court, after significant consideration and significant flip-flopping, determined that plaintiff's letter waived all of her remedies for right of first refusal. Judge Keith, in his December 25th, 2017 order, ultimately found facts and recited as facts things which were not contained in the record. Number one, there was no evidence that defendants Rossi or Collette agreed to unwind the transaction. There had been some self-serving deposition testimony by Joanne Slepica, the dual agent broker, again, who works for a brokerage firm that is now the subject of a third-party complaint brought by defendants Collette against the brokerage firm, that they had agreed to unwind it. But that was the first that plaintiff had ever heard about that at the deposition table. There was no evidence. In fact, the evidence was there was not a reconveyance of the property to Rossi's in order for the process to be gone over again. Number two, there was no evidence that King was given an opportunity to match the offer that Collette had made to the Rossi's. Instead, after the fact, King was given a one-page form that had both numbers of the lots listed, terms of the deal, it said, quote, cash, end quote. And that was it. There was nothing in there about a survey contingency, nothing in there about title evidence, nothing in there about professional inspections. And when we look at the 12-page contract that Collette had offered to Rossi's and Rossi's accepted, we find all of those things. In fact, we find things that are entirely inconsistent with the one-page form that was taped to plaintiffs. These are essential elements of the deal. Essential elements in the deal would include the elements that are important to buyers and sellers when they negotiate arm's-length transactions like this every day, which would include a survey contingency, a title commitment, a financing contingency that says, ultimately, if the buyer can't qualify for a loan, that they can get out of the deal, a professional inspection provision that would allow a buyer to get into the place and have somebody look at the plumbing and the heating and at the structure, even a walk-through provision. There was nothing like that referenced in the one-page form. And when plaintiff called in response to getting the one-page form, when plaintiff contacted the broker saying, hey, can we at least get into the place, the answer was no. I don't know who would want to buy this form. Is it common? Is that a common form that is given to every alternate buyer as your mom? The form appears. Based upon my experience, I had never seen that particular form before. The form appears to have been a form prepared by the brokerage firm. I can't say that it's a customary form in any way, shape, or form, particularly given Article 12's requirement that the offer be made on the same terms to the holder of the right of first refusal. And the form does not comply with Article 12. Mr. Frost, I have a couple of factual questions. Apparently, at some point, the Kletz went to the association and asked to have those two pieces of property deemed like one piece. Had that been the case with the Rossi's? Those two lots were not granted contiguous status, which is a term the association uses. Those two lots were not granted contiguous status until after the Kletz had purchased the property and the Kletz had applied for that status. And did that answer your question? It answered one, yeah. Was there a follow-up? There is. Okay. I think that I read that the lot 141 is landlocked. There is no way of access without 117, or 116. Is that correct? It is not correct. Lot 141, at the time of the transaction, had a garage with access right from Clubhouse Drive. There's access from that garage. Now, it's foot access. You've got to go up some stairs to get up to the house on lot 141. But the argument that it's landlocked is just not borne out by the facts of the case. After the transaction closed, and after the defendants, Kletz, had been served with a summons and a complaint in this case, they applied and were given approval to construct a second garage on lot 116 and to build an addition on the house on lot 141 so that it extends on to lot 116. This was all done after they were sued in this case. You'll probably hear a lot about how defendants, Kletz, are prejudiced in the case. But Plaintiff did not cause that. Defendants, Kletz, decided to build the new second garage on lot 116 for their own convenience. Lot 116 had its own access from Clubhouse Drive. But they won both access points, again, back-to-back. They were sold as a package, or did they not? They were sold as a package. They were sold as a package, yes, Your Honor. Counsel has two minutes. The defendants, Kletz, knew about this litigation, and they went on as they did, and did as they wished. With regard to any points not orally argued, we do stand on our briefs. In sum, the Rossis never offered to sell the property to Plaintiff at the price and on the same terms as the Kletz bonafide 12-page offer. Therefore, King's demand letter cannot be construed as a knowing waiver. The case fought to be remanded to the trial court with instructions for reversal and for summary judgment to be granted in Plaintiff's favor on counts one and two and in the alternative six. Are there any other questions for me? Thank you, Your Honor. Thank you, Mr. Ross. And, Mr. Lawson, you're going to go first. Is that my understanding?  Thank you, Your Honors. Good afternoon. May it please the Court. Counsel. My name is Jim Lawson, and I represent the Rossis in this matter. And I would submit to the Court that this case is a very simple case that involves waiver and that the resolutions should be very simple based upon waiver. The law of waiver is very straightforward and has been established for many years, that a waiver is a voluntary relinquishment of a known right, and once a waiver is committed, it is permanent and it cannot be withdrawn. This Court need look no further than Plaintiff King's August 1, 2015, response to right of first refusal, and that is actually what she labeled it, to determine if there is and always has been an unequivocal waiver in this case. In Plaintiff King's response on August 1, 2015, to the notice of right of first refusal that she was given, she stated, my right to purchase lot 116 cannot be made contingent upon also purchasing a lot adjacent to it. I hereby demand the right, pursuant to the restrictive covenants, to purchase lot 116 at its fair market value. You cannot defeat my rights. Does she question whether she has a right of first refusal to 141? I believe Plaintiff King had a right of first refusal with respect to any offer that was made to the Rossis that included real estate that they were selling. Did she have a right of first refusal to 141? Yes. Based on what? Based upon the way that the contract, the offer was drafted by the Kletz to the Rossis, that basically it was packaged. Okay, I thought, and maybe I'm wrong, I thought that her letter questioned whether she had a right to 141. I believe she was saying in her letter that she could not be compelled to purchase lot 141, that her right extended to lot 116, the vacant lot. And she took the position on August 1, 2015, that she could not be compelled to purchase lot 141, that that, in her opinion, was not consistent with the restrictive covenants. Okay, so how could she waive, how could she knowingly waive her right to 141 if she's questioning whether she had such a right? I do not believe that she was questioning whether or not she had that right. She was saying, you cannot force me to do that, and I will not do that. You cannot force me to do that, and I will not. And therein constitutes the waiver where she took a look at the Kletz offer and said, no, I refuse to match the terms of that offer because it includes lot 141. And you cannot do that to me, and I expressly refuse to do that. And therein constitutes the waiver. Now, there's been some talk about package deal, and I will submit to this Court that the concept of the package deal became irrelevant to this case based upon the position that Plaintiff King took before the trial court. Before the trial court, Plaintiff King, through her counsel, had an exchange with the trial court where Mr. Frost, Plaintiff King's counsel, stated, Judge, the plaintiff is not asking for anybody to rewrite the offer of purchase that was made here. And the trial judge, Judge Keith, stated, but it did go to both lots. Mr. Frost, it went to both lots, and my client didn't get the opportunity to match the terms of the deal, which would have included paying $146,000 and in exchange getting both lots, because that's what the deal was. That was Plaintiff King's position before the trial court, which should be contrasted with her position at the relevant time on August 1, 2015, when she took a position that was exactly the opposite to the rights that she was trying to assert before the trial court. Therein lies the waiver. August 1, 2015, Plaintiff King knew her rights under the restrictive covenant. That was her deposition testimony that she was familiar with Section 12.101. She knew what her rights were. Importantly, during the 10-day time period between receiving the notice of the right of first refusal and her August 1, 2015 response, she had this matter reviewed by counsel, and in fact her attorney, not Mr. Frost, her attorney at the time drafted this response, and Plaintiff King signed it. Now, somewhat disingenuously before the trial court and before this court, Plaintiff King says, well, this was inartfully drafted, and it wasn't even signed by an attorney. Well, what she leaves out is it wasn't signed by an attorney. It was written by her attorney and signed by her, and as recited in the briefs, Plaintiff King also said, I read this before I signed it. I understood it. I approved of its content, and most significantly, it reflects my intention on August 1, 2015. This is Plaintiff King's works on August 1, 2015. So the question is, does this content on August 1, 2015, when she took a very definite, unequivocal position, I will not match the terms of the Kletz offer. I will not. You can't force me to do that. I want that offer rewritten. I only want to purchase the vacant lot for whatever it's worth. But then before the trial court, she says, nope, I want to exactly match the Kletz offer, $146,000. Plaintiff King cannot go back in time and reverse what she did on August 1, 2015. Once a waiver is done, the law says it is permanent and cannot be undone. Now, Plaintiff King tries a variety of ways to avoid the consequences of what I submit as an unequivocal waiver. Her August 1, 2015 response, she states, I never received a copy of the actual offer. Well, Judge Keith hit the nail on the head at the trial level and basically said, well, with this criticism of not receiving a copy of the actual offer, don't you have to take a look at that question in light of her response on August 1, 2015? And anybody who reads this August 1, 2015 response I submit would conclude Plaintiff King didn't want to look at the offer that the Kletz had actually submitted, the 12 pages. She didn't care. She knew that it included both lots. She knew that it was $146,000, and she didn't want it. She wanted the vacant lot for her own purposes, lot 116, for an undisclosed sum. In terms of the actual offer or the actual words in a copy of the offer paid by the Kletz to the Rossi's, did not matter to Deb King on August 1, 2015. The Court should also note that Section 4.01 of the Restrictive Guidelines did not require an actual copy of the offer to be provided. Illinois common law does not require an actual copy of the offer to be provided. I've cited to this Court the White Hen Pantry case that states that non-essential terms of a purchase option do not have to be provided, that they can be supplied by implication, such as apportionment of real estate taxes or the type of deed to be provided or the closing date. All of those are non-essential terms. What are the essential terms? Essential terms, I would suggest, would be the geographic description, what is being sold. In this case, it was lot 116 and lot 141, and the price, $146,000. Counsel, that's two minutes. Were those on the notice? Yes. All right. And the notice, the notice of first refusal, does state that if you're interested in this offer, that's, you know, you notify them within the 10 days. It doesn't contemplate that you're going to set every detail there. I mean, it's the, whether you want to meet these terms and their level of interest. I would agree with that. That has to be noted back within that 10-day timeframe. So it started the ball rolling, if you're interested in it. I would agree with that, Your Honor. And in contrast to getting the ball rolling, Deb King basically took an unequivocal position. You cannot defeat my rights. You cannot do that. I will not match the terms that I offer. I only want to buy the vacant lot, which no offer has been individually made for that. Now, the best indicator as to whether or not Deb King actually wanted a copy of any offer is right here in her August 1, 2015 response. She didn't care. There's even a reference in the briefs, possibly before the trial court as well, about she didn't even know that appliances were included. Well, there were some used appliances being transferred from the Rossies to the flats, and I would respectfully submit to the court that if Deb King knew that a $50 used stove was going to stay in the kitchen, it would have changed her position on August 1, 2015. She didn't want the house. She only wanted the vacant lot. And that's what she put all of her eggs in one basket. I would also suggest to the court that when it comes to waiver, the conduct that this court has to look at is the conduct of the waiving party, in this case Plaintiff King. Plaintiff King wanted the trial court and now this court to look at anybody's conduct but her own. She wants to say, well, they didn't give me a copy of this offer, or it happened after the closing date, or technically the Rossies didn't own the property since the deed had already been exchanged, despite the undisputed fact that there was an agreement to unwind the transaction if necessary. She wants the courts to look at everybody else's conduct but her own. Her conduct is right here, August 1, 2015, and this is an unequivocal waiver. How's this time? I'm dividing my time with Mr. Unrath. I will simply take an additional minute, pursuant to informal agreement with Mr. Unrath, to touch upon one additional comment, and that is the mend the hold doctrine. The trial court based part of its order on mend the hold doctrine, that a plaintiff cannot take one position, have a reason for her conduct before litigation, and then get a different reason for her conduct after litigation as began. It causes prejudice to the other parties to the litigation. Judge Keith had even touched upon that and stated with respect to the multiple amendments of the complaints in this matter, Judge Keith stated, quote, It seems like at some point, Mr. Frost, this does get to be a little prejudicial. Mr. Frost, I agree, Judge. There was a last-ditch attempt to mend the hold by obtaining an assignment of a right of first refusal from a property owner not even involved in this litigation. That was the final and most egregious attempt to mend the hold, and the trial court stated to Mr. Frost, Well, I think the court is not going to allow that by the seat of its pants. And Mr. Frost's response, well, true. I think that speaks volumes about the number of times that there was an attempt to mend the hold in this case. Ed King tried to do anything during this litigation to avoid the consequences, but for unequivocal waiver on August 1, 2015, the case should rise and fall with respect to the right of first refusal based upon the August 1, 2015, document. Does mend the hold apply to plaintiffs? My read of the case law, Your Honor, I believe it does. I've read quite a few cases on that, and I respect opposing counsel's argument that it has to do with contract defenses, but I read into that case law, the general case law on mend the hold, that it is basically almost an equitable doctrine of fairness. You just don't change your position repeatedly throughout litigation, especially in a contract case, because it basically is grounded upon credibility, honesty, and fairness to the opposing party. So I believe my read on the mend the hold is it is a very general doctrine. Thank you. Thank you. I yield to Mr. Unrath. Good afternoon. My name is Craig Unrath. I represent Aloof Realty and have filed a brief on behalf of Carol and Bradford Klett. I just have a few brief comments. Justice McDade, you had questioned about the property being landlocked. Technically, it's not. If you would like access to this property without using lot 116, you can do so by climbing 80 steps up a steep hill. This house was built on a cliff. Now, it would be one thing to be a problem carrying groceries up 80 steps every day when you get home from work, but try to imagine buying a new refrigerator. Try to imagine bringing contractors in to build a new addition to your home. How do they get there? You cannot get a vehicle to that home without access to 116, and that's the only purpose 116 serves. It's a vacant lot. 116 has a driveway that goes to 141, right? That's correct, and that's really all it does. And to 141, what access is there with the steps from Clubhouse Drive? That's correct. 80 steps up a steep hill. To Parker and Clubhouse Drive and then walk up to the house. Right. That's correct. Now, this house was built in 1973. It had been sold four times before this, each time as a combined lot between 116 and 141. Plaintiff Deborah King knew that. She also testified that she knew that these lots would never be sold separately. So you have to question, what's the dynamic here? Why is it that she would say, I have a right to buy 116 and 116 only, and that she has the certain knowledge that that's unacceptable, that it would effectively landlock 141, rendering the property basically useless? What is her point there? That's my biggest question about this case. But the bottom line is this. When they learned that there had been a mistake on the right of first refusal, my client, the realtor, spoke with the clets, and they agreed to unwind the deal completely. If Deborah King wanted to match that offer, she could get it. And this is really the basis of Judge Keith's order here. Judge Keith looked at this, and he said, When you have a breach of contract, the remedy is to put the non-breaching party into the same position they would have been in had there been no breach. And that's exactly what was done. And as Judge Keith pointed out, the law requires no further remedy. We tried to do that. She rejected it. Now, in terms of the rejection letter itself, the complaint is that, well, it didn't include all the details. What about an inspection of the house? What about the roof, furnace, all these details that are left out? Well, that could have easily been put in their letter. It could have said, We accept this offer. We want to do this subject to an inspection of the furnace, subject to having the roof inspected. There wouldn't have been any problem with that, but that's not what we got. What my clients received was a letter stating they rejected it under any terms. It was a total and complete rejection. She insisted that she would only buy 116 and 116 alone, which she knew would effectively land Lot 141. They submit that, in all fairness, plaintiff's position in this case is untenable. It becomes even more untenable when they begin to change their theory, the relief that they're seeking. Suddenly, you know, they start off by saying, We only want 116, and you cannot defeat our rights. That's the only lot we want. Then it changes to, Well, we'll take both lots. Well, they've just cited law saying that foreign jurisdiction laws say that you cannot defeat rights by packaging land. Well, they've certainly waived that argument, because others say that they're willing to accept a deal for both lots. Well, that deal was offered to them. They were told that we will unwind the deal completely. Would you like to make an offer? And they said no. We only want to offer. We want a different deal. We want 116 alone, and we want a different price at fair market value, even though there's nothing in the restricted covenants that suggests that it must be sold at fair market value. Counsel, one minute. The bottom line is this. In my view, we're dealing with issues of basic fairness here. Deborah King knew exactly what was going on here. She worked for the association for 22 years. She had never once seen anybody attach the actual contract for sale to a right of first refusal. She's asking for something that she's never even heard of happening before. Had she wanted to work out a deal, if she wanted to work out a compromise, that option was available to her. What we got instead was a simple short letter saying no. I want lot 116. That's all I want, and I'm going to determine what the price is going to be. Is there no further questions? Thank you, Your Honor. Thank you, Mr. Enright and Mr. Frost. There was a question about whether the right of first refusal goes to both lots. And that is a matter of the remedy. To a large extent, it depends on what remedy applies to package deals in Illinois. And if the remedy, the applicable remedy hasn't been determined, it could be one of three. How would a similarly situated plaintiff decide how they're going to respond to this kind of situation? It seems that no matter what the plaintiff would have put into a letter, it would have been the wrong choice. And we'd be here making the same arguments. But Article 12, if we look at the language of Article 12, it's pretty clear on what lot the right of first refusal would adhere to. It's the lot on the left. Well, first you face the rear of the lot you want to sell. You ask the person on the right, then you ask the person on the left. So Article 12 talks just about the lot. And that's lot 116. Now, whether or not 141 has to be included or shouldn't be included, that's a matter of Illinois law that hasn't been decided yet. And we can't figure it out. But it seems no matter what we would have asked for or what we would have demanded, it would have been the wrong thing to demand. There was a question about the rights of first refusal form that the brokerage firm taped to the garage door. And the language of that says, as agent for the owners of lots 116 and 141, I have received an offer to purchase this property at a price of $146,000, terms cash, as owners of the adjacent lot to the blank of said property or the association. We now with this form offer it to you under the same terms. What are those terms? If you read the rest of that, it says, so if you have an intent to do that, that's how you find out the terms, is that you notify us within the 10 days that you're interested in pursuing this. If the form made that clear, I think I would understand that. But it says, please check one at the bottom. And there's a blank for yes. And it says, I slash we would like to purchase lots blank for blank. And that blank is the smallest blank in the world. So I don't know how you write in. We want a survey contingency and an inspection clause and all that stuff. Or the second option is, no, we are not interested in the above offer, which would suggest that this is, this is the whole offer right here. But it wasn't. This was not the whole offer. Article 12 says at the price and on the terms, said owner shall then offer to sell said lot at the price and on the terms contained in the bona fide offer. When plaintiff got this form, she called the broker and said, hey, can we do a walkthrough? She was told no. I remember back when you were talking about the form and what box did they have checked. They didn't check either box, did they? They initiated a completely different response to that. They didn't say, we don't understand this or we need a different term. We need to know what the terms are. They said, this is what we will do. We will buy one piece of property in one lot only. So that was a response. As much as you said that is not the correct notice, the response isn't correct either. Let's say the plaintiff had checked this box, yes, and submitted it. What have the plaintiffs just agreed to? Had they agreed to buy property without an inspection, a cash deal, no contingencies whatsoever? Let's say they checked this box, yes, and they submitted it and they put a little asterisk saying we want to survey contingency and inspection clause. But what if the Collette's offer didn't have those things? Then I think that they are entitled to the same deal. But would they have waived their rights if they put something on this form that wasn't in the 12-page contract that Collette's had tendered to Rossi's and wasn't the contract? I mean, that's the troubling part for me in terms of analyzing this in the context of waiver. Counselors, one minute. One of the points that we touched on in the briefs and I think I wanted to mention is that there's a section 11-107 of the Code of Civil Procedure that talks about a circumstance where a plaintiff may not have asked for the proper remedy or the correct remedy when asking for injunctive relief. And that's the circumstance that we have here. And plaintiff did ask twice to amend her complaint to allege any of the three possible remedies she could possibly be entitled to here. And that was the same exact relief that the retreat court gave to the folks in that case. You know, it does get prejudicial. And I agree and I do agree that it gets prejudicial after a certain point. And I think that the plaintiff is prejudiced in this case. There was no evidence before the trial court that Lot 141 would be rendered useless. People live in condos and apartments with flights of stairs. They find a way to get the refrigerator up to the apartment or the condo. The idea that everyone is entitled to be able to drive their car right to their entryway door is not borne out in modern society. There are folks that have to go upstairs. Counsel's time. Thank you very much. Thank you, Mr. Frost. And thank you all for your argument today. I'm going to take this matter under advisement and get back to the original disposition. I'm going to now take a short recess for a moment.